**A F F I D A V I T**

**STATE OF WEST VIRGINIA**

**COUNTY OF KANAWHA, to-wit:**

I, Jennifer L. King, being first duly sworn, do hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant to search 3633 Greenbrier Street, Charleston, West Virginia 25311 (hereafter referred to as "SUBJECT PREMISES #1"); FreeDome, 1601 Bigley Avenue, Charleston, West Virginia, 25302 (hereafter referred to as "SUBJECT PREMISES #2"); and 418 Sheridan Circle, Charleston, West Virginia 25314 (hereafter referred to as "SUBJECT PREMISES #3"); all of which are used by JASPER WEMH (hereafter "WEMH") for the purpose of storing and/or distributing controlled substances and/or storing and maintaining drug proceeds (collectively "SUBJECT PREMISES"). WEMH stores large amounts of controlled substances at 3633 Greenbrier Street, Charleston, West Virginia 25311. WEMH owns and operates a business, a smoke shop called FreeDome, located at 1601 Bigley Avenue, Charleston, West Virginia, 25302, and it is used by WEMH to conduct money transactions related to drug debts. WEMH's residence is located at 418 Sheridan Circle, Charleston, West Virginia 25314. As set forth herein, probable cause exists that WEMH has committed and continues to commit violations of the following offenses enumerated in Title 18, United States Code, Section 2516(1):  (i) the distribution and

possession with intent to distribute controlled substances in violation of Title 21, United States Code, Section 841(a)(1); (ii) conspiracy to commit and attempts to commit these offenses, in violation of Title 21, United States Code, Section 846; (iii) money laundering of drug trafficking proceeds and conspiracy to launder money, in violation of Title 18, United States Code, Sections 1956 and 1957; and (iv) use of a communications facility in facilitating the commission of the foregoing offenses, in violation of Title 21, United States Code, Section 843(b) ("TARGET OFFENSES"). Further, probable cause exists that evidence, proceeds, and fruits and instrumentalities of the TARGET OFFENSES are currently located within the SUBJECT PREMISES more particularly described in ATTACHMENT A.

2. I am a Special Agent employed by the United States Department of Justice, the Federal Bureau of Investigation (hereinafter "FBI"), and as such I am a "federal law enforcement officer" within the meaning of Fed. R. Crim. P. 41(a)(2)(C) and am authorized to apply for federal search warrants.  I have been employed as a Special Agent of the Federal Bureau of Investigation ("FBI") since February 2008, and I am currently assigned to work drug investigations in the Charleston, West Virginia Resident Agency of the Pittsburgh Division.  Previously, I was assigned to the Long Island Resident Agency of the New York Division and served as a member of the Long Island Gang Task Force ("LIGTF").  As a member

of the LIGTF, I investigated drug trafficking, money laundering, gangs, violent crimes, and other offenses.   I have personally participated in over 100 arrests and search warrants and have been an affiant on numerous federal Title III affidavits.   Prior to joining the FBI, I was employed as a police officer with the Clarksville Police Department located in Clarksville, Tennessee and as a chemist with the Drug Enforcement Administration ("DEA") for approximately one year.

3. During my tenure with the FBI, I have participated in numerous drug investigations during the course of which I have (a) conducted physical and wire surveillance; (b) executed search warrants at locations where drugs, drug proceeds, and records of drugs have been found; (c) reviewed and analyzed numerous taped conversations and records of drug traffickers; (d) debriefed cooperating drug traffickers; (e) monitored wiretapped conversations of drug traffickers and reviewed line sheets prepared by wiretap monitors; and (f) conducted surveillance of individuals engaged in drug trafficking.   Through my training, education, and experience, I have become familiar with (a) the manner and methods by which illegal drugs are imported and distributed; (b) the method of payment for such drugs; and (c) the efforts of persons involved in such activity to avoid detection by law enforcement.

4. I am an investigative or law enforcement officer within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United

States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516.  Among other duties, I am participating in an investigation relating to the distribution of controlled substances by WEMH, ALEXANDRIA JASMINE ESTEP (hereinafter "ESTEP"), JUSTIN ALLEN BOWEN (hereinafter "BOWEN"); STANLEY AARON BURKES ("hereinafter "BURKES"); other persons known; and others as yet unknown (hereinafter "SUBJECT INDIVIDUALS"), in violation of 21 U.S.C. §§ 841(a)(1), 843(b), and 846, that is, distribution of controlled substances, use of a communication facility to facilitate drug trafficking, and conspiracy to distribute controlled substances.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses. Summaries of recorded conversations are based on draft transcripts of those conversations.  This affidavit is intended to show that there is probable cause for the requested warrants and does not set forth all my knowledge about this investigation.

6. On October 14, 2022, the Honorable Thomas E. Johnston, Chief United States District Court Judge in the Southern District of West Virginia, entered an order authorizing the interception of wire and electronic communications over a telephone used by WEMH (hereinafter "TARGET TELEPHONE #1").  On November 8, 2022, the Honorable Thomas E. Johnston, Chief United States District Court

Judge in the Southern District of West Virginia, entered orders authorizing the interception of wire and electronic communications over a telephone used by WEMH (hereinafter "TARGET TELEPHONE #1"), a telephone used by BOWEN (hereinafter "TARGET TELEPHONE #2") and a telephone used by ESTEP (hereinafter "TARGET TELEPHONE #3"). Intercepted communications have confirmed that WEMH, BOWEN, and ESTEP are involved in distributing large quantities of methamphetamine in and around Kanawha County, West Virginia and within the Southern District of West Virginia.    Interceptions are currently scheduled to expire on December 7, 2022.

7. A Confidential Informant (hereinafter, "CI1") has conducted multiple controlled methamphetamine purchases and payments to WEMH. CI1 hopes that in exchange for his/her cooperation, CI1 will obtain leniency for a pending federal charge (Felon in Possession of a Firearm and Ammunition in violation of 18 U.S.C. § 922(g)(1)) and receive monetary compensation.  No promises have been made to CI1. CI1's information has proven to be reliable and has been corroborated by other facts learned in the investigation.  CI1 has a previous conviction for felony possession of cocaine.  CI1 has signed a plea agreement with the United States Attorney's Office for the Southern District of West Virginia related to CI1's possession of a firearm and ammunition as a felon. The plea agreement has not been filed in court. Since 2019, CI1 has completed multiple successful controlled drug purchases for the

Metropolitan Drug Enforcement Network Team ("MDENT") and CI1's information has been used to obtain search warrants and a Title III affidavit in a Drug Enforcement Administration ("DEA") investigation that involved a drug trafficking organization ("DTO") separate from the one being investigated in this case. During the prior Title III investigation with the DEA, CI1 was intercepted conducting a drug transaction without the consent of investigators.   Investigators determined this because they intercepted wire communications involving CI1.  CI1 was called by investigators and CI1 turned over the controlled substances that were purchased by CI1.  The information provided by CI1 has been corroborated by the audio and video recordings of CI1's controlled methamphetamine purchases, controlled methamphetamine repayments to WEMH, obtaining methamphetamine on consignment from WEMH under law enforcement supervision, officer surveillance, GPS tracker information, information provided by another confidential informant, and toll and pen register analysis.   On or about August 24, 2022, CI1 advised investigators that s/he was provided approximately 20 pounds of methamphetamine by WEMH approximately two weeks earlier from inside SUBJECT PREMISES #2.  CI1 advised that s/he sold approximately 16 pounds of it and provided law enforcement with the remaining 4 pounds.   Law enforcement believes CI1 is still credible, and that his/her information is reliable because it has been corroborated in multiple ways as

stated above.  When confronted about the drug activity conducted without law enforcement's knowledge or consent during this investigation and the previous DEA investigation, as described above, I have found CI1 to be honest.

### Probable Cause

8. Based upon the facts of this investigation and the information contained in this affidavit, probable cause exists that WEMH currently stores controlled substances, firearms, currency and other evidence of drug trafficking as more fully described in ATTACHMENT B at the SUBJECT PREMISES.

9. In June 2021, MDENT obtained a search warrant for WEMH's residence which was then located at 405 52nd Street SE, Charleston, West Virginia.  During the search of WEMH's residence, $40,000 of U.S. Currency was located in the master bedroom.  WEMH cooperated with law enforcement during the search warrant execution and stated the money seized from his residence was from selling methamphetamine.  WEMH also took law enforcement to a residence on Veazy Street in Charleston that he used as a stash house for his methamphetamine distribution network.  The residence contained a small amount of methamphetamine, and it was clearly used as a stash house, as it was mostly empty and only contained an inflatable mattress.  From my training and experience, people who distribute large quantities of illegal drugs often have a residence(s) that they use to store illegal drugs, cutting agents and U.S. Currency.

Drug distributors believe law enforcement will not be able to locate or associate the residence(s) to them. Based on WEMH's past practices and the current investigation, law enforcement believes that WEMH utilizes his current residence, SUBJECT PREMISES #3, to store drug proceeds.

10.    In approximately July 2022, CI1 advised law enforcement that WEMH told CI1 that he would pass off his methamphetamine supplier once WEMH had a half million dollars saved.  WEMH also told CI1 that he planned to have that amount of money by Spring 2023.

11.    On October 14, 2022, at approximately 8:32 PM, WEMH on TARGET TELEPHONE #1 (Session 00020), received an incoming call from ESTEP, on (304) 932-2552.    Based   on   my   training, experience, and the facts of the investigation, in this call, ESTEP called WEMH in response to WEMH's prior text message stating "Yo". ESTEP told WEMH that she was trying to meet him and asked if he was available tonight ("Tryin to get with you. Can you meet me tonight?").  WEMH responded yes ("Yeah, hello"). ESTEP then asked for further guidance and direction from WHEM ("So?"). WEMH then asked ESTEP if she was ready to meet him now ("You ready now?"). ESTEP replied yes and then explained that she could be ready and on her way in the next 15 minutes, and that she had to go the house in South Charleston to grab the money first for payment to WEMH for controlled substances that she previously obtained from WEMH

8

("Um, yeah. I can be ready in a uh, I can be ready in the next 15. Like be on my way in the next 15. I gotta go to the crib, well to, up to South Charleston and grab it real quick. Grab this cash."). WEMH agreed and told ESTEP to meet him at the Go Mart an 9:30 PM ("Alright uh, (U/I male in background) meet me at the Go Mart at um . . . 9:30.") ESTEP agreed to meet WEMH ("Alright bet.").

12.     Officers traveled to the area of GoMart, 1626 Bigley Avenue, Charleston, West Virginia to conduct surveillance. At approximately 9:43 PM, WEMH's blue Ford Pickup arrived and parked in the rear section of the parking lot.  WEMH appeared to be using his cell phone.  Within minutes of WEMH parking, a female wearing all black clothing, later identified to be ESTEP, entered the rear passenger door of WEMH's vehicle.  At approximately 9:45 PM, the female exited WEMH's vehicle and began walking west through the parking lot.  WEMH left GoMart and traveled to SUBJECT PREMISES #2 where he arrived at approximately 9:46 PM and then exited his vehicle, according to pole camera surveillance.  According to physical surveillance, ESTEP exited WEMH's vehicle walked from the GoMart parking lot to the sidewalk on the east side of Bigley Avenue.  ESTEP was carrying a white plastic bag.

13.     On October 16, 2022, law enforcement met CI1 to make a controlled payment to WEMH for methamphetamine previously obtained from WEMH.  At 5:21 PM, CI1 called WEMH on TARGET TELEPHONE #1 and the call went to voicemail. At 5:36 PM, WEMH on TARGET TELEPHONE

#1 called CI1 back. CI1 told WEMH that s/he had money for WEMH towards the payment of methamphetamine that CI1 previously obtained from WEMH. WEMH told CI1 to come to SUBJECT PREMISES #2. At approximately 5:37 PM, CI1 and CI1's vehicle were searched by officers and they were both found free of contraband and U.S. Currency. CI1 was provided $3,700 of pre-recorded buy money and an electronic recording device that is capable of transmitting live audio/video. At 5:40 PM, CI1 traveled to SUBJECT PREMISES #2. A pole camera that is located in the area of SUBJECT PREMISES #2 was monitored by officers. WEMH's blue Ford pickup truck (West Virginia temporary registration 325849 and vehicle identification number 1FTEW1EP5KFB78955) was parked in front of SUBJECT PREMISES #2 during the meeting between WEMH and CI1. At approximately 5:48 PM, CI1 arrived at SUBJECT PREMISES #2 and met WEMH outside of SUBJECT PREMISES #2. The electronic recording device was monitored by officers along with the pole camera. During their conversation, WEMH advised CI1 to place the money (pre-recorded) in the bed of his blue Ford pickup, which CI1 did.  CI1 was observed by officers walking to the rear area of the blue Ford pickup. WEMH and CI1 had a conversation and at approximately 5:55 PM, CI1 left SUBJECT PREMISES #2. At 5:56 PM, WEMH was observed on pole camera going to the bed of his blue Ford pickup and then walking inside SUBJECT PREMISES #2. At 6:04 PM, law enforcement met CI1 at a pre-determined location. Law enforcement conducted a debrief with CI1

regarding the controlled payment.    CI1 stated that when s/he arrived at SUBJECT PREMISES #2, s/he met with WEMH outside of SUBJECT PREMISES #2. CI1 stated that WEMH told CI1 to place the money in the bed of the truck, which CI1 did.  Law enforcement conducted a search of CI1 and CI1's vehicle after the transaction with WEMH and they were both found free of contraband and U.S. Currency.

14.    On October 16, 2022 at approximately 6:30 PM, law enforcement was monitoring the GPS tracking device attached to WEMH's Ford truck and the pole camera located at SUBJECT PREMISES #2.   WEMH's Ford truck was at SUBJECT PREMISES #1 and left at approximately 9:02 PM.  WEMH traveled from SUBJECT PREMISES #1 to SUBJECT PREMISES #2 and arrived at approximately 9:11 PM.   WEMH exited his vehicle and carried a garbage style bag into SUBJECT PREMISES #2.

15.    On October 16, 2022, at 8:31 PM, WEMH on TARGET TELEPHONE #1 (Session 00036), received an incoming call from BOWEN. Based on my training, experience, and the investigation thus far, I believe WEMH asked BOWEN if they were meeting tonight to conduct a drug transaction ("Tonight right?").  BOWEN advised yes and asked what time WEMH would be available ("Yeah, yeah. What time are you, what time are you going to be available?").  WEMH asked if BOWEN was available now ("You, you available now?").  BOWEN advised that he would be as soon as he picked up drug proceeds from Kelly's Creek

("Well, I will be as soon as I get done. I gotta, I'm headed to Kelly's Creek real quick to pick up this money, then I will be."). WEMH acknowledged ("Alright") and BOWEN advised that he would call WEMH as soon as he left Kelly's Creek ("Uh, It'll probably be about, let me call you as soon as I get back out of Kelly's Creek.").

16.    At approximately 9:52 PM, WEMH on TARGET TELEPHONE #1 (Session 00038), placed an outgoing call to BOWEN.  Based on my training, experience, and the investigation thus far, I believe BOWEN advised WEMH that he was ready to meet him to conduct a drug transaction and that he was on the interstate ("Oh nothing, just uh, right here on the interstate.").  WEMH told BOWEN to meet him at GoMart, 1626 Bigley Avenue, Charleston, West Virginia ("I'll meet you at the GoMart.").  BOWEN confirmed which GoMart to meet WEMH at ("Okay, uh GoMart by the, right there at Westmoreland?") and WEMH confirmed that he was correct ("Yeah").  BOWEN told WEMH that he would be there in five to ten minutes ("Alright I'll be there in about like 10 minutes, 5 minutes, 5-10 minutes.")

17.    At approximately 9:59 PM, BOWEN sent WEMH a text message (Session 00039) and indicated he was at the GoMart.  During this time, WEMH was observed inside SUBJECT PREMISES #2.    At approximately 10:00 PM, WEMH exited SUBJECT PREMISES #2 carrying what appeared to be a garbage bag.  WEMH walked through a parking lot located across the street from SUBJECT PREMISES #2 and traveled

north towards GoMart on foot.  Surveillance observed WEMH walk from the rear area of GoMart and approach a gray Dodge Charger. As WEMH approached the Dodge Charger, the trunk of the car opened and it appeared that WEMH placed an item into the trunk.  Once the item was placed in the trunk by WEMH, the Dodge Charger exited the parking lot and WEMH walked back to the area of SUBJECT PREMISES #2, where he returned at approximately 10:05 PM.  When WEMH returned, he was not carrying the bag that he was observed carrying when he left.  Surveillance officers followed the gray Dodge Charger.  The Charger traveled on to Interstate 77, merged on to Interstate 79 north, and exited at the Mink Shoals exit.  The vehicle had temporary West Virginia registration 347-655, which is registered to "Justin Bowen, 3252 Moles Drive, Charleston, WV". The Charger was followed to a set of storage units at Appalachian Mini Storage, 110 Dutch Road, Mink Shoals, West Virginia.  Law enforcement observed the driver of the vehicle enter a storage unit.  Surveillance units cleared the area at that time.

18.    On October 19, 2022, at 4:54 PM, WEMH on TARGET TELEPHONE #1 (Session 00053), placed an outgoing call to BURKES at telephone number (304) 415-6332. Based on my training, experience, and the investigation thus far, BURKES told WEMH that he had a quantity of money for WEMH ("Uh, I got that 18."). WEMH acknowledged and asked if BURKES wanted more controlled substances ("Alright. You ready for some more, or no?"). BURKES responded "Yeah." WEMH advised

that he would meet BURKES after his wife gets home which would be around 9:00 PM ("Alright, um. I'm just waiting for my wife to get back. As soon as she get back, um. It'll probably be around like... around like 9 o'clock when I come meet you or something."). BURKES told WEMH to give him a call when WEMH was ready and let him know where to meet WEMH ("Just give me a call and let me know where.").

19.    On October 19, 2022 at approximately 8:55 PM, WEMH called BURKES on telephone (304)415-6332 (Session 55) and advised BURKES to meet him at the "first" 7-Eleven in Kanawha City (3815 MacCorkle Ave SE, Charleston, West Virginia). Within four minutes of the call, WEMH was observed by officers on pole camera entering his blue Ford pickup and leaving SUBJECT PREMISES #3. During this time, members of law enforcement conducted surveillance in the area of 7-Eleven. The GPS tracking device on WEMH's vehicle showed him traveling from SUBJECT PREMISES #3 to MacCorkle Avenue, traveling east on MacCorkle, then onto Chesterfield Avenue to 39th Street where he parked on the east side of the 7-Eleven parking lot. It appeared that WEMH was conducting counter surveillance because he was using side streets to travel to the 7-Eleven. WEMH arrived at the 7-Eleven at approximately 9:10 PM and was observed entering the passenger side of a red Ford Focus, bearing West Virginia handicap registration 43965, that he parked beside. Surveillance followed the red Ford Focus after it departed the 7-Eleven. The Focus stopped at a Par Mar store, 1503 Washington

14

Street East, Charleston at approximately 9:17 PM, and met with a female. The vehicle traveled south on Ruffner Avenue and then east on Virginia Street.  When the vehicle turned on Virginia Street, law enforcement lost sight of the vehicle for several minutes, but it was located shortly thereafter in the rear parking lot of Carroll Terrace Apartment Complex.  The vehicle did not have any occupants when located.  Surveillance on the red Ford Focus concluded at that time.  WEMH arrived back at SUBJECT PREMISES #3 at approximately 9:21 PM. Based on data from the GPS tracker attached to WEMH's blue Ford pickup, WEMH traveled back to SUBJECT PREMISES #3 after meeting with BURKES without stopping.

20.    On October 22, 2022, CI1 sent a text message to WEMH on TARGET TELEPHONE #1 in an effort to set up a controlled buy for two pounds of methamphetamine.  At 1:53 PM (Session 00156), WEMH, on TARGET TELEPHONE #1, placed an outgoing call to CI1.  Based on my training, experience, and the investigation thus far, CI1 told WEMH that s/he wanted to meet with WEMH to conduct a drug transaction ("Ah man I was going to come holler at you real fast.").  CI1 advised WEMH that he wanted two pounds of methamphetamine like last time ("I'm just going to stick with the same thing man for right now, until I can get everything straightened out here, you know what I'm saying?").  WEMH stated that he needed some time to get the methamphetamine ("Alright gimme, gimme, gimme a few minutes. I gotta, you know I gotta get

it together."). CI1 asked if WEMH was going to call CI1 when he was ready ("You just gonna hit me back?"). WEMH told CI1 that he would ("Yeah I'm a hit you back.").

21. On October 22, 2022 at 2:54 PM (Session 00158), WEMH on the TARGET TELEPHONE, placed an outgoing call to CI1. Based on my training, experience, and the investigation thus far, WEMH called CI1 to tell him/her to meet at GoMart located at 1502 Greenbrier Street, Charleston, West Virginia ("Yeah, meet me, um, at that GoMart, you know, on that back road."). CI1 told WEMH that he would be there in 20 to 25 minutes ("Okay. Okay bro. I'll be there in like 20, 25 minutes.").

22. CI1 and CI1's vehicle were searched by officers and they were both found free of contraband and U.S. Currency. CI1 was provided $3,700 of pre-recorded buy money and an electronic recording device that is capable of transmitting live audio and video.[1] CI1 arrived at the GoMart located at 1502 Greenbrier Street, Charleston, West Virginia at approximately 3:05 PM. The pole camera that is located in the vicinity of SUBJECT PREMISES #2 was monitored by officers during this time. WEMH's blue Ford pickup departed SUBJECT PREMISES #2 at approximately 3:38 PM. The GPS tracker on WEMH's vehicle was monitored by officers while WEMH's vehicle traveled to SUBJECT PREMISES #1. Officers also monitored

---

[1] CI1 was provided an additional $5 from the pre-recorded buy money by investigators to purchase a beverage while waiting at the GoMart.

the pole camera in the vicinity of SUBJECT PREMISES #1. At approximately 3:46 PM, WEMH was observed exiting his truck and entering SUBJECT PREMISES #1. At 3:47 PM, WEMH texted CI1 that he would be at GoMart in five minutes. At approximately 3:53 PM, WEMH exited SUBJECT PREMISES #1 carrying what appeared to be a green bag, entered his truck, and then traveled towards the GoMart. WEMH traveled directly to the GoMart and arrived at approximately 3:58 PM. The conversation between CI1 and WEMH was monitored by officers live, and CI1 was heard telling WEMH that s/he was providing WEMH $3,700. At 4:12 PM, law enforcement met CI1 at a pre-determined location. CI1 provided law enforcement with the suspected methamphetamine that was located in a green plastic bag. Law enforcement conducted a debrief with CI1 regarding the controlled transaction. CI1 stated that s/he provided WEMH the $3,700 and obtained the methamphetamine that was on the passenger side seat of WEMH's vehicle. Law enforcement conducted a search of CI1 and CI1's vehicle and they were both found free of contraband and the prerecorded buy money. At approximately 4:16 PM, WEMH's truck was observed on pole camera arriving back at SUBJECT PREMISES #2. The suspected methamphetamine weighed 902.3 grams and field tested for the presence of methamphetamine. Based on this transaction, officer surveillance, and GPS tracking information, as well as other information learned during this investigation, investigators

17

believe SUBJECT PREMISES #1 is used by WEMH to store controlled substances.

23.     On October 25, 2022, at 5:35 PM, WEMH, on TARGET TELEPHONE #1 (Session 00278), placed an outgoing call to BURKES, at telephone number (304)415-6332. Based on my training, experience, and the investigation thus far, I believe WEMH is scheduling to meet with BURKES to obtain money from BURKES for controlled substances that were previously provided to BURKES by WEMH's DTO. WEMH asked BURKES if he would be available to meet at 9 PM ("Hey. Hey, whatch you goin be doin around like, 9 tonight?"). BURKES replied that he would be available ("Uh, yeah I'll be out") and asked if he would see WEMH or another member of the DTO ("Do I see you or do I see him or?"). WEMH advised that it would be him ("I'ma, I'ma see you") and then told him he would meet him again at the 7-Eleven located at 3815 MacCorkle Ave SE, Charleston, West Virginia like he did previously on October 19, 2022 ("I'm, probably going to meet at the 7-Eleven again. ").

24.     On October 26, 2022 at approximately 10:15 PM, WEMH's vehicle arrived at SUBJECT PREMISES #1 and parked in the driveway in front of the residence. WEMH remained in his vehicle until approximately 10:36 PM, when a maroon Dodge Challenger SRT Hellcat, registered to Randy Pleva at the address associated with SUBJECT PREMISES #1, arrived at SUBJECT PREMISES #1. WEMH met with the male driver outside of their vehicles. After speaking for a brief

moment, WEMH and the male entered the front door of SUBJECT PREMISES #1.  At approximately 10:48 PM, WEMH and the male exited the front door and walked to the area of WEMH's vehicle.  WEMH left the driveway of SUBJECT PREMISES #1 in his vehicle and the male re-entered SUBJECT PREMISES #1.

25.    On October 26, 2022, at 10:49 hours, WEHM, on TARGET TELEPHONE #1 (Session 00284), placed an outgoing call to BURKES, at telephone number (304)415-6332. The following was discussed:

WEHM:      Yo, I'm trying to call you. You there?

BURKES:    Yeah, yeah, yeah. I'm up. (Stammering) I'm, I'm, I'm on my way.

WEHM:      Alright, alright.

BURKES:    Alright.

26.    Based on my training, experience, and the investigation thus far, I believe WEMH called BURKES to tell him that he was ready to meet BURKES at the 7-Eleven for the purpose of giving BURKES controlled substances.

27.    Law enforcement observed WEMH's vehicle arrive at 7-Eleven and park near the gas pumps at approximately 11:02 PM.  WEMH met with a male who was driving a red Ford Focus.  Law enforcement observed WEMH and the male meet for several seconds before the red Ford Focus traveled from the 7-Eleven to MacCorkle Avenue.  The Ford Focus had West Virginia handicap registration 43965. Surveillance observed the vehicle traveling towards the East End

of Charleston.    At approximately 11:10 p.m., law enforcement observed the red Ford Focus arrive at Carroll Terrace, 1546 Kanawha Blvd E., Charleston, West Virginia and park.   At approximately 11:12 p.m., BURKES entered the apartment complex and appeared to be carrying a bag consistent with what CI1 receives from WEMH when s/he purchase two pounds of methamphetamine.

28.    On October 29, 2022, law enforcement met with CI1 to make a controlled payment to WEMH. At approximately 4:20 PM, CI1 and CI1's vehicle were searched by officers and they were both found free of contraband and U.S. Currency. At 4:27 PM, CI1 called WEMH on TARGET TELEPHONE #1. CI1 told WEMH that s/he wanted to drop off money to WEMH towards the payment of methamphetamine that CI1 previously obtained from WEMH. WEMH told CI1 to come to SUBJECT PREMISES #2. CI1 was provided $3,700 of pre-recorded buy money and an electronic recording device that is capable of transmitting live audio/video.   At 4:29 PM, CI1 traveled to SUBJECT PREMISES #2. The pole camera that is located in the vicinity of SUBJECT PREMISES #2 was monitored by officers during this time. WEMH's blue Ford pickup was parked in front of the store during the transaction. At approximately 4:37 PM, the CI1 arrived at SUBJECT PREMISES #2 and met WEMH inside of the store. The electronic recording device was monitored by officers along with the pole camera. During the conversation between CI1 and WEMH, CI1 told WEMH that s/he had $3,700 for WEMH. CI1 exited SUBJECT PREMISES #2

at approximately 4:39 PM carrying a black plastic bag and departed the store. At 4:48 PM, law enforcement met CI1 at a pre-determined location. Law enforcement then conducted a debrief with CI1 regarding the controlled payment. CI1 stated that when s/he arrived at SUBJECT PREMISES #2, s/he met with WEMH inside of the store. CI1 stated that s/he dropped the pre-recorded buy money over the counter while talking to WEMH. WEMH gave the CI1 a bag of tobacco. Law enforcement conducted a search of the CI1 and CI1's vehicle and they were both found free of contraband and U.S. Currency. Based on my training, experience, and facts learned during this investigation, I believe WEMH gave CI1 the bag of tobacco to make it look as if CI1 was a customer of the store and to disguise the fact that he and CI1 were involved in a drug-related transaction inside the store.

29.    On October 29, 2022, WEMH, on TARGET TELEPHONE #1, exchanged text messages with BOWEN, on telephone (304)542-1150. The following was discussed:

> WEMH (Session 00314 at 11:29 AM): Yo
>
> BOWEN (Session 00315 at 12:27 AM): I was goin to come holor at u later
>
> WEMH (Session 00318 at 1:15 PM): Okay
>
> WEMH (Session 00320 at 7:26 PM): You still come through I'm at the spot
>
> BOWEN (Session 00321 at 7:26 PM): Yes give me a min

BOWEN (Session 00322 at 7:27 PM): I'm headed home now

WEMH (Session 00323 at 7:27 PM): Okay

BOWEN (Session 00325 at 9:57 PM): Yo

BOWEN (Session 00326 at 9:57 PM): I was about to be there cool

WEMH (Session 00327 at 10:05 PM): Okay

30.    Based on my training, experience, and the investigation thus far, I believe BOWEN reached out to WEMH to advise him that he was going to travel to SUBJECT PREMISES #2 to provide WEMH money for controlled substances that WEMH previously provided BOWEN.

31.    Officers monitored the pole camera located in the vicinity of SUBJECT PREMISES #2. At approximately 10:10 PM on the same date, BOWEN's vehicle arrived at SUBJECT PREMISES #2. BOWEN entered SUBJECT PREMISES #2.  Geolocation data on BOWEN's phone also showed BOWEN in the vicinity of SUBJECT PREMISES #2.  BOWEN was observed by officers inside of SUBJECT PREMISES #2 and appeared to be having a conversation with WEMH. At approximately 10:24 PM, BOWEN left the store and began traveling north on Bigley Avenue. BOWEN's vehicle pulled in at the gas pumps at GoMart, 1626 Bigley Avenue, Charleston, West Virginia.  BOWEN exited his vehicle and walked inside the store.  BOWEN returned to his vehicle, remained at GoMart until approximately 10:37 PM, then left.

32.    On October 30, 2022 at approximately 1:07 PM (Session 00335), WEMH sent a text message stating "That was only 29,990

from yesterday". At 2:03 PM (Session 00336), BOWEN responded "My bad". Based on my training, experience, and the investigation thus far, BOWEN met with WEMH at SUBJECT PREMISES #2 and provided WEMH $29,990 for payment for controlled substances that BOWEN previously received from WEMH.

33.     On October 31, 2022 at 3:09 PM, WEMH, on TARGET TELEPHONE #1 (Session 00357), received a text message from ESTEP on (304)932-2552. Based on my training, experience, and the investigation thus far, I believe ESTEP asked WEMH if she could bring WEMH $10,000 for payment for past controlled substances that ESTEP received from WEMH, and asked if WEMH could bring her more controlled substances ("Can I bring you 10 ? And you get me something together?").

34.     On October 31, 2022, at 4:23 PM, WEMH, on TARGET TELEPHONE #1 (Session 00362), placed an outgoing call to ESTEP, at telephone number (304)932-2552. Based on my training, experience, and the investigation thus far, ESTEP asked if WEMH received her previous text regarding paying WEMH $10,000 and receiving more controlled substances from WEMH ("I was seeing if you got my text message or not."). WEMH told ESTEP that he did and that he would provide her more controlled substances and get the money from ESTEP later tonight because WEMH does not like conducting drug transactions during the day ("Ya I got your text. You know, just gonna have to wait til tonight though, ya know what I mean? I don't

like doin nothin really during the day time."). ESTEP asked what time they will meet and if WEMH will call her (" Do you want me, what time, you gonna call me?"). WEMH advised that he would call her and that it would be at night ("Ya. It's going to be tonight though, know what I mean? Just.. not right now.").

35.     On October 31, 2022, at 10:39pm, WEMH, on TARGET TELEPHONE #1 (Session 00371), received an incoming call from ESTEP, at telephone number (304)932-2552. Based on my training, experience, and the investigation, WEMH told ESTEP that he was going to text her the address where she needs to meet WEMH to conduct a drug transaction ("Bout to send you and addy, meet me there."). ESTEP replied "Alright."

At 10:46 PM (Session 00372), WEMH on TARGET TELEPHONE #1, sent ESTEP a text message stating "601 wise acres Dr Charleston WV 2531" to telephone number (304)932-2552. Based on my training, experience, and the investigation thus far, I believe this is where WEMH wanted to meet ESTEP to provide her controlled substances.

36.     On October 31, 2022, at 10:48pm, WEHM, on TARGET TELEPHONE #1 (Session 00373), placed an outgoing call to BOWEN, at telephone number (304)542-1150. Based on my training, experience, and the investigation thus far, WEMH called BOWEN to see if BOWEN had more money for WEMH and if BOWEN was ready to obtain additional methamphetamine. BOWEN told WEMH that he was ready to meet WEMH to conduct a drug transaction whenever WEMH was ready ("Not shit.

24

Just laying here, getting ready for work.. (sighs) Uh, I was ready whenever you are."). WEMH replied that he was ready to meet BOWEN now if BOWEN is ready ("I mean shit, if you ready right now, I'm ready right now for ya."). BOWEN said he had to be up early for work and asked if he could meet WEMH tomorrow after BOWEN gets off of work ("I gotta work in the morning. I got to be up at 4, uh. How about after work tomorrow?"). WEMH advised BOWEN that he only conducts drug transactions at night or on the weekends and suggest that they wait till the weekend ("Aw shit, um.. Shh aw, you know me, it definitely got to be uh, later, so I don't know if you just want to just wait, you just want to wait til the weekend?"). BOWEN said he would meet WEMH now ("We can do it now.") and then asked where he should meet WEMH ("Yeah, where, how, where, where I gotta come to?"). WEMH told BOWEN to meet him at the apartments located at 601 Wise Acres Drive, Charleston, West Virginia ("You know the apartments."). BOWEN agreed to meet WEMH and advised that he just needed to get dressed and then he would get into his vehicle ("Yeah, alright. Alright, let me just get my clothes on, jump in my car."). WEMH asked BOWEN how long he would be ("About how long?"). BOWEN responded 15 to 20 minutes ("Uh.. Fifteen, twenty minutes, I'll be over there.").

37. On October 31, 2022 at 11:11 PM (Session 00382), WEMH received a text message from ESTEP stating "Here" using telephone number (304)932-2552. At 11:13 PM (Session 00383), WEMH received

a text message from BOWEN stating "Yo I'm bout to pull in" using telephone number (304)542-1150.

38.   At approximately 10:56 PM, ESTEP departed her residence in a dark colored Nissan Altima with Iowa registration.   ESTEP arrived at 601 Wise Acres Drive, Charleston, West Virginia at approximately 11:05 PM.   ESTEP waited several minutes before she sent WEMH a text message indicating she was there (Session 00382). WEMH departed from SUBJECT PREMISES #2, traveled directly to SUBJECT PREMISES #1, and arrived at approximately 11:08 PM.   The pole camera in this area was monitored by officers and WEMH entered the front door of SUBJECT PREMISES #1.   At approximately 11:16 PM, WEMH exited SUBJECT PREMISES #1 and traveled to the area of 601 Wise Acres Drive and parked. BOWEN arrived in the area of 601 Wise Acres Drive at approximately 11:15 PM and parked a few parking spaces away from ESTEP's vehicle.   At approximately 11:18 PM, WEMH arrived at this location and parked across the parking lot from BOWEN and ESTEP and met with BOWEN first.   Surveillance units observed BOWEN walk over to WEMH's truck and meet with WEMH on the driver's side of the vehicle.   BOWEN then walked from WEMH's truck carrying a large black trash bag and placed it in the trunk of his car.   Surveillance units advised the bag appeared to have a substantial amount of weight to it because Bowen was carrying the bag with both hands.   BOWEN left after the transaction. Surveillance units then observed WEMN approach the passenger side

of ESTEP's vehicle where he leaned inside for several seconds. After meeting ESTEP, WEMH walked back to his vehicle. At approximately 11:21 PM, WEMH and ESTEP left from the area of 601 Wise Acres Drive and traveled south on Greenbrier Street. The GPS tracker on WEMH's truck was monitored by officers after the transaction with BOWEN and ESTEP. WEMH's vehicle traveled continuously from 601 Wise Acres Drive to I-64 West, exited off the Dunbar exit, then back onto I-64 East, exited at Oakwood Road, traveled up to Oakwood Road near CVS, turned onto Cantley Drive, and then traveled to SUBJECT PREMISES #3. WEMH's vehicle did not stop at any locations. Based on my training, experience, and the investigation thus far, I believe WEMH was conducting counter surveillance to be sure that law enforcement was not following him. Based on the circumstances of this transaction, the transaction between WEMH and BURKES on October 19, 2022, as previously described in this affidavit, and other facts learned during this investigation, investigators believe that WEMH is keeping at least some of the proceeds from his illegal activities at SUBJECT PREMISES #3.

39.  On November 2, 2022, WEMH, on TARGET TELEPHONE #1, exchanged text messages with BOWEN on telephone (304)542-1150. WEMH (Session 00398) asked BOWEN how much money BOWEN gave him on October 31, 2022 ("What was your count on that money you give me the other night"). BOWEN replied $9,000 ("9"). WEMH replied $8,520

("8520"). WEMH told BOWEN that he needed to be more careful counting the money ("I don't if you are count those or having someone help you but you might want to either count it yourself or triple count and take your time while doing so"). BOWEN stated that he obtained a money counter to utilize when paying WEMH ("I got u I got a counter now I bought last night").

40.    On November 10, 2022, at 7:39 PM, WEMH, on TARGET TELEPHONE #1 (Session 00472), placed an outgoing call to BURKES at telephone (304)415-6332. Based on my training, experience, and the investigation thus far, I believe WEMH told BURKES to meet WEMH at WALGREENS, 3801 MacCorkle Ave SE, Charleston, West Virginia so that WEMH could conduct a methamphetamine transaction with BURKES ("Yeah. I'll be at the Walgreens. Um.. At um at 9:20 in Kanawha City."). BURKES agreed to meet him ("Okay.").

41.    On November 10, 2022 at 7:43 PM, WEMH, on TARGET TELEPHONE #1 (Session 00473), placed an outgoing call to BURKES at telephone (304) 415-6332. Based on my training, experience, and the investigation thus far, I believe WEMH told BURKES that he forgot about the time change and changed their meeting time to 8:20 PM at Walgreens ("I forgot that time went back. I meant um.. I meant um.. 8:20."). BURKES agreed to meet at 8:20 PM ("Okay.").

42.    At approximately 7:43 PM, WEMH departed SUBJECT PREMISES #3. The GPS tracking device on WEMH's vehicle was monitored. WEMH'S vehicle traveled from SUBJECT PREMISES #3 to SUBJECT

PREMISES #1. WEMH arrived at SUBJECT PREMISES #1 at approximately 7:56 PM and entered the residence through the front door. WEMH left SUBJECT PREMISES #1 at approximately 8:12 PM and began traveling south on Greenbrier Street. At approximately 8:13 PM, surveillance officers observed BURKES vehicle travel east on MacCorkle Avenue and pull into the parking lot of Walgreen's. Shortly after BURKES arrived, he was observed standing outside his vehicle, which was a red Ford Focus and the same vehicle he has been observed driving each time he and WEMH have met. Law enforcement continued monitoring the GPS tracking device on WEMH'S vehicle and noticed him traveling directly from SUBJECT PREMISES #1 to Walgreen's. WEMH arrived at Walgreen's at approximately 8:23 PM. Upon WEMH'S arrival to Walgreen's, surveillance observed BURKES approach the front passenger side of WEMH'S vehicle and open the door. BURKES was observed leaning inside WEMH'S vehicle for several seconds before closing the door and returning to his vehicle. When BURKES exited the parking lot, he traveled west on Venable Avenue. WEMH stayed on the lot for several minutes. When WEMH left Walgreen's, he traveled directly to SUBJECT PREMISES #2. BURKES traveled back to his residence and entered his apartment complex carrying a white grocery style bag, which is consistent with the way WEMH has provided methamphetamine to CI1 during this investigation. Based on training, experience, and the investigation thus far, investigators believe WEMH received some

29

payment from BURKES from past methamphetamine obtained from WEMH and WEMH took the money to SUBJECT PREMISES #2.

43.     On November 13, 2022, WEMH, on TARGET TELEPHONE #1, sent BOWEN the text "Yo" (Session 00520) at approximately 11:10 AM.  At approximately 11:18 AM, BOWEN sent WEMH (Session 00521) a text message on TARGET TELEPHONE #1 that he was getting a shower and would be down ("What up my bad bro I got sick as fuck last night ima jump in shower and I'll be down).  WEMH on TARGET TELEPHONE #1 (Session 522) at 11:18 AM replied "Ok" to BOWEN.  Based on my training, experience, and the investigation thus far, I believe BOWEN told WEMH that he would be coming to SUBJECT PREMISES #2 to bring money to WEMH for the debt owed to WEMH from the methamphetamine that WEMH previously supplied to BOWEN.

44.     At approximately 1:23 PM, BOWEN arrived at SUBJECT PREMISES #2 and met WEMH, who was standing outside when BOWEN arrived.  BOWEN and WEMH had a short conversation and it appeared that WEMH unlocked his truck.  BOWEN walked to the passenger side of his vehicle, removed a white bag, and placed it in the front passenger side of WEMH'S truck.  BOWEN and WEMH then entered the store for a short amount of time before BOWEN left.  At approximately 1:33 PM, WEMH went to the passenger side of his truck and it appeared that he removed the item and took it inside SUBJECT PREMISES #2.  Based on my training, experience, and the investigation thus far, I believed BOWEN placed a bag of money in

WEMH's vehicle and WEMH removed it after BOWEN departed and took it inside SUBJECT PREMISES #2.

45.   Since approximately September 21, 2022, a pole camera has been located in the area of SUBJECT PREMISES #3. During that time, WEMH has been regularly observed via the pole camera located in the area of SUBJECT PREMISES #3, and from the timing and frequency of his stays it appears that he uses SUBJECT PREMISES #3 as his primary residence.

46.   On or about August 4, 2022, after receiving state court authorization, a GPS tracker was installed onto WEMH's Chevrolet Tahoe. On or about October 14, 2022, after receiving Court authorization in the form of a Search Warrant signed by the Honorable Dwane L. Tinsley, United States Magistrate Judge, a GPS tracker was installed onto WEMH's 2019 blue Ford Pickup, West Virginia temporary registration 325849. The tracker along with Title III intercepts helped provide the purpose of travel, meetings, and other activity. Based on the tracker information and Title III intercepts, WEMH travels mainly to and from the SUBJECT PREMISES. During this investigation, aside from the SUBJECT PREMISES, WEMH has only been observed regularly travelling to banks and locations where he commonly conducts drug transactions with his customers (typically convenience stores such as 7-Eleven or Go-Mart). Based on my training, experience, and the investigation thus far, including WEMH's pattern of travel as

31

established by facts learned during the investigation, I believe that WEMH currently stores controlled substances, firearms, currency and other evidence of drug trafficking in the SUBJECT PREMISES.

47. At SUBJECT PREMISES #2 it appears there are cameras located on the exterior of the business. Businesses often have video surveillance inside. Based on my training, experience, and the investigation thus far, I believe video surveillance inside the store would show WEMH meeting with drug customers such as BOWEN and ESTEP and constitute persuasive evidence of their activities. Therefore, this warrant also seeks authorization to seize any digital storage device located in SUBJECT PREMISES #2 that may contain video surveillance footage from inside or outside SUBJECT PREMISES #2.

BACKGROUND: ITEMS TO BE SEIZED

48. Based upon my experience and training, consultation with other law enforcement officers experienced in drug and financial investigations, and all facts and opinions set forth in this affidavit, I know that:

a) Individuals involved in drug trafficking often maintain the following items in their residences: controlled substances and paraphernalia for packaging, weighing,

cutting, testing, distributing, and manufacturing controlled substances; the proceeds of drug trafficking; and records relating to drug trafficking.

b) Individuals involved in drug trafficking often maintain records of their drug transactions and other records of evidentiary value for months or years at a time. It is common, for example, for drug traffickers to keep pay/owe sheets or other papers of drugs sold and monies owed. Such pay/owe sheets or papers are used as a basis for accounting and for settling existing debts. Such records are often maintained for a substantial period of time, even after the debts are collected. I have found in my training and experience that such records are invaluable to drug traffickers and that such records are rarely discarded. Finally, it has also been my experience that such records and pay/owe sheets also frequently include the names, identities and telephone numbers of suppliers, customers, and co-conspirators.

c) Individuals involved in drug trafficking must often rely on others to obtain their drugs and to help them market the narcotics. Frequently, traffickers maintain evidence of the identities of these co-conspirators at their residences.

d) Individuals involved in drug trafficking commonly earn income in the form of cash and try to legitimize these profits. In order to do this, traffickers frequently attempt to secrete, transfer and conceal the money by means including: placing assets in the names of other individuals so that they may avoid detection while maintaining control; laundering the money through what appears to be legitimate business or businesses; hiding money in their homes, safes and safety deposit boxes; or using the money to buy assets which are difficult to trace. Records of these and other types of transactions are often found at residences of individuals involved in narcotics trafficking.

e) Individuals involved in drug trafficking often keep and maintain large amounts of United States currency at their residences. Such funds are often used for everyday expenditures and to maintain and finance their ongoing drug business. Additionally, individuals involved in drug trafficking often amass and maintain assets at their residence which were generated by their trafficking activities or purchased with the cash earned from such trafficking.

f) Individuals involved in drug trafficking often maintain weapons, firearms, and ammunition on their person or in

their residence and/or vehicles. Such weapons and firearms are used, and can be used, as an instrumentality of the crime of possession and distribution of drugs and firearms. Furthermore, I am aware of instances in which traffickers have maintained such items in their residences and vehicles in order to protect themselves and guard their drugs, firearms and profits, as well as for enforcement purposes during their drug and firearms dealings.

g) Residences and premises used by individuals involved in drug trafficking usually contain articles of personal property evidencing the identity of person(s) occupying, possessing, residing in, owning, frequenting, or controlling the residence and premises.

h) Individuals involved in drug trafficking frequently communicate with co-conspirators by means of cellular telephones and electronic paging devices and usually maintain these items on their person and/or in their residences and vehicles.

i) Individuals involved in drug trafficking often utilize radio scanners, police radios and other electronic equipment in order to conduct counter-surveillance upon law enforcement authorities, and usually maintain these

items on their person and/or in their residences and vehicles.

j) Individuals involved in drug trafficking often maintain photographs, and/or audio and video recordings of their associates or real and personal property which were acquired with drug proceeds or property utilized to facilitate drug trafficking activities. Such items are typically maintained in their residences. Drug traffickers often store information relating to their drug trafficking business on computers and/or computer disks.

49.    Documents/Records: It is also my opinion and belief that the above-described documents are currently possessed by drug dealers and manufacturers in much the same way that a legitimate business will maintain records and tools of its trade whether or not the business has a particular item in inventory on a given date. These documents are kept by drug dealers whether or not the dealer is in possession of any drugs and chemicals at any given moment. I believe that the seizure of such documents will provide evidence of the events set forth in this affidavit and that such documents can be found at the target location despite any lapse of the time between the events described and the anticipated search pursuant to this warrant.

50.     Cellular Telephones: In this case, there is probable cause that WEMH utilizes cellular telephones to facilitate his drug trafficking activities.  It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular telephones today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. Cellular service providers allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered on in a secure environment or, if possible, started in "airplane mode" which disables access to the network.  Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and instead store information in volatile memory within the device or in memory cards inserted into the device.  Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired.  Conversations can

be hidden in various applications. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer. Consequently, this warrant seeks authorization to seize and secure cellular telephones found at the SUBJECT PREMISES and to search or analyze the same off-site by one or more trained examiners.

51.   The investigation into the criminal activities of the above individuals reveals that their drug distribution activities are ongoing. Due to the quantities of drugs being distributed and the relatively sophisticated manner in which the above individuals conduct their illegal activities, I believe they have been engaged in the illegal sale of drugs for a long period of time. Based on my training and experience, I believe that the criminal activity described above is, by nature, self-perpetuating. Several of the participants involved in the drug distribution have been targets of law enforcement for several years. Some have been arrested on drug distribution investigations in the past, but these arrests have not deterred them from continuing in the business of drug trafficking and distribution. I believe that the items described in Attachment B will provide evidence of the events set forth in this affidavit and that such articles can be found at the SUBJECT

PREMISES despite any lapse of time between the events described and the anticipated search pursuant to this warrant.

Further your Affiant sayeth naught.

Respectfully submitted,

Jennifer L. King, Special Agent
Federal Bureau of Investigation

Sworn to me by telephone or other reliable or other reliable electronic means on November 17 , 2022.

Omar J. Aboulhosn
United States Magistrate Judge

39